[Cite as *State v. Adams*, 2018-Ohio-604.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## CHAMPAIGN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 2017-CA-7 |
| | : | |
| v. | : | Trial Court Case No. 2016-CRB-1004 |
| | : | |
| JANINE ADAMS | : | (Criminal Appeal from |
| | : | Municipal Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 16th day of February, 2018.

. . . . . . . . . . .

JARED CHAMBERLAIN, Atty. Reg. No. 0090785, Assistant Municipal Prosecutor, 205 South Main Street, Urbana, OH 43078
    Attorney for Plaintiff-Appellee

TRAVIS KANE, Atty. Reg. No. 0088191, 1015 East Centerville Station Road, Centerville, Ohio 45459
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Defendant-appellant, Janine Adams, appeals from her conviction in the Champaign County Municipal Court for domestic violence following a jury trial. In support of her appeal, Adams contends that her conviction is against the manifest weight of the evidence. For the reasons outlined below, the judgment of the trial court will be affirmed.

## Facts and Course of Proceedings

{¶ 2} On December 29, 2016, a complaint was filed charging Adams with domestic violence in violation of R.C. 2929.25(A), a misdemeanor of the first degree. The complaint alleged that on the evening of December 28, 2016, Adams knowingly engaged in a physical altercation with her sister, Lauren Adams ("Lauren"), which caused minor injuries to Lauren's face as well as a nosebleed.

{¶ 3} Adams pled not guilty to the domestic violence charge and the matter proceeded to a jury trial. At trial, the State called Lauren to testify regarding the altercation with her sister. Lauren testified that on the evening in question, she and her two daughters were at the home of her and Adams's mother, Michelle Adams ("Michelle"), located in Urbana, Ohio. Lauren claimed that she and her daughters had been staying with Michelle over the Christmas holiday and that she was in the midst of packing up their belongings to go back home when Adams arrived at the residence. Lauren explained that Michelle had custody over Adams's two children and that Adams came to the residence to spend time with her children.

{¶ 4} Continuing, Lauren testified that while she was packing in the front room of

the residence, two of the children came to her and said that Adams and Michelle were arguing in the kitchen. In response, Lauren testified that she went to see what was going on and overheard Adams arguing with Michelle about Adams's visitation with her children. Lauren testified that Adams was arguing loudly and that Michelle asked her to lower her voice. At that point, Lauren claimed that she chimed in and agreed that Adams should lower her voice because the children were getting scared.

{¶ 5} Lauren testified that after she told Adams to quiet down, Adams started attacking her character and bringing up negative events from Lauren's past. As a result, Lauren claimed that she and Adams began to argue in each other's faces. In the midst of their arguing, Lauren claimed that Adams shoved her and punched her on the right side of the face and nose. Lauren then testified that Adams grabbed her hair and would not let go despite their mother, Michelle, getting in between them. Lauren testified that she tried to put her hands on Adams to defend herself, but Adams had her bent over and would not let go of her hair. As a result, Lauren testified that she grabbed a knife out of the kitchen drawer, which ultimately caused Adams to release her hair and ended the altercation.

{¶ 6} As a result of the altercation, Lauren testified that she suffered a bloody nose, irritated eye, loss of hair, and bruises on her arms. Lauren identified photographs of her facial injuries at trial as well as photographs of her blood on the kitchen floor. Lauren also identified photographs depicting two scratches on Adams's face, which Lauren claimed Adams received during the altercation. Lauren testified that she did not start the verbal argument or initiate the physical altercation with Adams. Lauren further testified that she called 9-1-1 to report the incident.

{¶ 7} Lauren and Adams's mother, Michelle, also testified at trial. Michelle confirmed that Lauren and Adams were at her residence on the evening in question. According to Michelle, Adams wanted to take her children to a movie that evening, but she told Adams it was too late. Michelle also advised Adams that the children would not be spending the night with Adams. In response, Michelle testified that Adams became upset and started to argue with her in the kitchen. Michelle claimed that Lauren came into the room about five minutes later and joined the argument.

{¶ 8} Michelle testified that Adams and Lauren were getting very close to one another as they were arguing. As a result, Michelle claimed that she ran over and got in between them just before the argument turned physical. Michelle claimed that she was unable to see who threw the first blow because she was focused on trying to separate her daughters. However, Michelle confirmed that Adams grabbed Lauren by the hair and bent Lauren over as she was holding her hair. During this time, Michelle testified that she noticed Lauren was dripping blood on the kitchen floor. Upon seeing this, Michelle told Adams: "[S]he's bleeding. Let her go." Trial Trans. (Mar. 9, 2017), p. 191. Despite Michelle's repeated pleas for Adams to "let her go," Adams refused to let go of Lauren's hair. *Id.*

{¶ 9} Michelle further testified that Lauren was stumbling around trying to kick Adams, but that she never saw Lauren make physical contact with Adams. Michelle did, however, observe Lauren grab a knife from the kitchen drawer. Michelle testified that the knife had a cover on it and that Lauren eventually put the knife down after being told to do so two or three times. Thereafter, Michelle claimed that Adams let go of Lauren's hair and the altercation ended.

**{¶ 10}** Deputy Brandon Fenwick of the Champaign County Sheriff's Office testified that he was dispatched to the scene where he observed Lauren with blood on her face. Fenwick testified that he made contact with Lauren who advised him that she got into a physical altercation with Adams. Fenwick claimed that Lauren told him Adams struck her in the face several times, which caused her nose to bleed. Lauren also told Fenwick that Adams struck her first.

**{¶ 11}** Fenwick testified that he investigated the area where the altercation occurred and observed blood on the kitchen floor. According to Fenwick, the scene matched how Lauren had described the incident. Fenwick also testified that he took photographs of the kitchen floor and Lauren's facial injuries, which he identified at trial. Fenwick then took written statements from Lauren and Michelle, and briefly spoke with Michelle's husband, Don Napier, who did not see the altercation take place.

**{¶ 12}** After getting written statements from Lauren and Michelle, Fenwick testified that he attempted to make contact with Adams at her residence. Upon discovering that Adams was not home, Fenwick called Adams using a phone number provided to him by Michelle. Fenwick claimed that Adams answered his call and advised him that she was on her way to the hospital for a head injury. Fenwick then went to the hospital where he eventually met with Adams. While at the hospital, Fenwick claimed that Adams told him that she had an altercation with her sister, Lauren; however, Fenwick testified that Adams's story of how the altercation started did not match what Lauren had told him. According to Fenwick, Adams told him that Lauren hit her first and pulled a knife on her.

**{¶ 13}** Fenwick further testified that he only observed a scratch on the right side of Adams's face, which in Fenwick's experience, appeared to be a defensive wound from

somebody being attacked. Fenwick also testified that he took photographs of the scratch on Adams's face, which he identified at trial. Based on what he observed and what he had been told by Lauren and Michelle, Fenwick testified that he believed Adams was the primary aggressor and decided to charge Adams with domestic violence.

{¶ 14} In addition to Fenwick's testimony, the State presented testimony from two emergency medical technicians who responded to Lauren's 9-1-1 call. Both technicians testified that they were dispatched to the scene and that they observed and documented Lauren's injuries, which included a controlled nosebleed that was not actively bleeding when they arrived. The documentation of Lauren's injuries was admitted into evidence and the technicians confirmed that they left the scene without providing Lauren with any medical treatment.

{¶ 15} After the State rested its case, Adams moved for a Crim.R. 29 acquittal, which the trial court denied. Thereafter, in her defense, Adams presented the testimony of her friend, Harold Floyd, who admitted to having no first-hand knowledge of the altercation in question. Adams also presented the testimony of her adult son, Shaquille Adams, who also had no first-hand knowledge of the altercation. Shaquille merely testified that he had lived with Lauren for six to eight months and that she was very argumentative.

{¶ 16} In addition to Harold and Shaquille's testimony, Adams chose to testify in her defense, against the advice of counsel. Adams testified that on the evening in question she was "thrown for a loop" when Michelle told her that her children would not be spending the night with her. Trial Trans. (Mar. 9, 2017), p. 262. As a result, Adams testified that she and Michelle began to argue over her visitation with the children.

Shortly thereafter, Adams testified that as she was attempting to leave the residence, Lauren came into the room and started arguing with her as well. Adams testified that she never attacked Lauren, but admitted that she and Lauren started "tussling" after Lauren hit her twice. *Id.* at 268. According to Adams, Michelle then got in between her and Lauren and backed her up against the kitchen sink. Adams claimed that Michelle was leaning over top of her as Lauren continued to attack her, and that Lauren eventually grabbed a knife. Adams then testified that her stepfather intervened and helped her leave the residence through the back door.

{¶ 17} Following this testimony, Adams testified that she was at a disadvantage during the altercation and that she did not intentionally grab Lauren's hair. Although Adams testified that she had no idea that she had bloodied Lauren's nose until she saw blood on the floor, she later testified that she did not know whose blood was on the floor. Thereafter, in an attempt to prove self-defense, Adams claimed that she was afraid during the altercation because Lauren pulled a knife on her and because she was obstructed from leaving the residence and was fearful of being trapped.

{¶ 18} Finally, as part of her cross examination, Adams admitted that she had a prior altercation with Michelle that resulted in her being convicted for disorderly conduct. Adams also admitted to being convicted of a fifth-degree felony theft offense in Champaign County in 2011, as well as a theft offense in Washington D.C.

{¶ 19} Following this testimony, Adams rested her case. The parties then gave closing arguments and the trial court provided the jury with instructions that included an instruction on self-defense. Based on the testimony and evidence presented at trial, the jury deliberated and found Adams guilty of domestic violence as charged. The trial court

then sentenced Adams to 90 days in jail, suspended 85 of those days, and gave Adams two days of jail time credit. The trial court also placed Adams on probation for two years, during which time Adams is prohibited from having any contact with Lauren.

{¶ 20} Adams now appeals from her domestic violence conviction, raising a single assignment of error for review.

**Assignment of Error**

{¶ 21} Adams's sole assignment of error is as follows:

APPELLANT'S CONVICTION MUST BE REVERSED BECAUSE IT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 22} Under her assignment of error, Adams contends that her conviction for domestic violence is against the manifest weight of the evidence because there were no witnesses who could testify to how the fight between her and Lauren started, nor any witnesses who could corroborate Lauren's version of events. As a result, Adams claims the jury lost its way by finding Lauren's version of events more credible. Adams further argues that her conviction is against the manifest weight of the evidence because she proved the affirmative defense of self-defense. We disagree with Adams's claims.

{¶ 23} "When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Hill*, 2d Dist. Montgomery No. 25172, 2013-Ohio-717, ¶ 8, quoting

*State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "A judgment should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 24} " 'Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.' " *State v. McDonald*, 2d Dist. Montgomery No. 27237, 2017-Ohio-8496, ¶ 21, quoting *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). Accordingly, "[t]he credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve." *Id.*, citing *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).

{¶ 25} "This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict." *State v. Carpenter*, 2d Dist. Clark No. 2016-CA-66, 2017-Ohio-8905, ¶ 26, citing *State v. Bradley*, 2d Dist. Champaign No. 97-0CA-03, 1997 WL 691510, *4 (Oct. 24, 1997).

{¶ 26} As previously noted, Adams is challenging her conviction for domestic violence under R.C. 2919.25(A), which provides that: "No person shall knowingly cause or attempt to cause physical harm to a family or household member." A defendant may

escape criminal liability under this statute if he or she is acting in self-defense. *State v. Streight*, 3d Dist. Auglaize, No. 2-01-23, 2002 WL 235445, *1 (Feb. 14, 2002), citing *State v. Thomas*, 77 Ohio St.3d 323, 673 N.E.2d 1339 (1997). "To establish self-defense, a defendant must introduce evidence showing that: (1) he was not at fault in creating the violent situation; (2) he had a bona fide belief that he was in imminent danger of bodily harm; and (3) he did not violate any duty to retreat or avoid the danger." *State v. Brown,* 2017-Ohio-7424, ___ N.E.3d ___, ¶ 24 (2d Dist.), citing *Thomas* at 326 and *State v. Williford,* 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990). Therefore, "[t]o support a claim for self-defense, a defendant must demonstrate that he acted out of fear, or he felt that his life was threatened." *State v. Crawford*, 2d Dist. Montgomery No. 22314, 2008-Ohio-4008, ¶ 26.

**{¶ 27}** In this case, Adams does not dispute the fact that that she and Lauren are family members who got into a physical altercation on December 28, 2016, that resulted in physical harm to Lauren. Adams, however, disputes the fact that she was the primary aggressor who started the altercation. Because no one witnessed how the physical fight started between Adams and Lauren, it was Adams's word against Lauren's as to who created the violent situation. Whether Adams's or Lauren's version of events was more credible was for the jury to determine. In finding Adams guilty, the jury clearly found Lauren's version of events more credible. Contrary to Adams's claim otherwise, the jury did not lose its way and create a manifest miscarriage of justice simply because it found Lauren more credible. *See State v. Dorsey*, 2d Dist. Montgomery No. 26831, 2018-Ohio-34, ¶ 44.

**{¶ 28}** That said, much of Lauren's story is corroborated by their mother Michelle's

testimony. For instance, both Lauren and Michelle testified that Adams grabbed Lauren by the hair and refused to let go. Both Michele and Lauren also testified that Adams had Lauren bent over and that Lauren was bleeding on the kitchen floor when Lauren grabbed a knife. There is also no dispute that Lauren, not Adams, called 9-1-1 to report the altercation. The record further indicates that Adams merely suffered a couple of scratches to her face, while Lauren had a bloody nose, injury to her eye, loss of hair, and bruising. With respect to Adams's injuries, Deputy Fenwick testified that the scratches on Adams's face appeared to be defensive wounds inflicted by someone who was being attacked.

{¶ 29} Based on this evidence, a reasonable jury could conclude that Adams was the primary aggressor who started the physical altercation with Lauren. A reasonable jury could also conclude that Adams did not have a bona fide belief that she was in imminent danger of bodily harm. The only evidence on that issue was Adams's testimony that she was afraid when Lauren grabbed a knife. There is no other evidence indicating that Adams was acting out of fear of bodily harm during the altercation. Rather, the majority of the evidence indicates that Adams was the primary aggressor and that Lauren grabbed the knife in a defensive manner. Regardless, the jury was not required to believe Adams's testimony regarding her alleged fear. Accordingly, the jury did not clearly lose its way and create a manifest miscarriage of justice in failing to find that Adams acted in self-defense.

{¶ 30} For the foregoing reasons, we do not find that the evidence weighs heavily against Adams's domestic violence conviction. Accordingly, Adams's sole assignment of error is overruled.

## Conclusion

**{¶ 31}** Having overruled Adams's sole assignment of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and TUCKER, J., concur.

Copies mailed to:

Jared Chamberlain
Travis Kane
Hon. Gil S. Weithman